**Fred G. BOUSTANY, D.M.D., d/b/a Boston Dental, Plaintiff,**

v.

**BOSTON DENTAL GROUP, INC., Defendant.**

**No. Civ A 98–11640–RCL.**

United States District Court, D. Massachusetts.

March 18, 1999.

102

Robert R. Pierce, Thomas E. Kenney, Pierce & Mandell, PC, Boston, MA, for Fred G. Boustany, plaintiff.

Roger T. Manwaring, Kevin F. Moloney, Barron & Stadfeld, Boston, MA, for Boston Dental Group, Inc., defendant.

*MEMORANDUM AND ORDER ON PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION*

LINDSAY, District Judge.

## I. Introduction

The plaintiff, Fred Boustany, D.M.D., P.C., d/b/a Boston Dental ("the plaintiff" or "Boston Dental"), has brought this action against the defendant, Boston Dental Group, Inc. ("BDG"), alleging that BDG: (1) has violated the provisions of the Lanham Act, 15 U.S.C. § 1125(a) (false designation of origin), (2) has committed common-law trademark infringement, (3) has violated Mass.Gen.L. ch. 110B, the Massachusetts trademark act, (4) has committed common-law unfair competition, and (5) has violated Mass.Gen.L. ch. 93A. The plaintiff has requested that the court, pending a trial on the merits, issue a preliminary injunction prohibiting BDG from using the name "Boston Dental Group" or any similar name in connection with dental services provided by BDG in Massachusetts.

## II. Background[1]

In 1983, a dentist, Dr. Paul Scola, began using the service mark "Boston Dental" to describe his dental practice and offices in Boston. *See Verified Complaint* ¶ 5. Dr. Scola used the mark continuously until 1987, when the plaintiff purchased Dr. Scola's practice, the right to use the mark, and the goodwill associated with the mark. *See id.* ¶¶ 5–6. The plaintiff has used the mark in connection with his practice ever since 1987. *See id.* ¶ 6.

When the plaintiff bought Dr. Scola's practice, the practice had five full-time employees and 1,450 patients. *See Third Affidavit of Fred G. Boustany, D.M.D.* ("*Third Boustany Aff.*") ¶ 3. The plaintiff now has twenty-one employees and more than 15,000 patients. *See id.* ¶ 4. The plaintiff has used the mark "Boston Dental" on all advertising since 1987. That advertising has appeared in the *Boston Yellow Pages, see Supplemental Affidavit of Fred G. Boustany* ("*Supp. Boustany Aff.*") ¶ 4, the *Boston Today* coupon book, the *Boston Business Journal*, and other publications, *see Third Boustany Aff.* ¶ 16. The plaintiff has spent at least $100,000 advertising and marketing his services under the mark. *See Supp. Boustany Aff.* ¶ 12.

Apart from published advertising, the plaintiff identifies his practice in a number of other ways by reference to the mark. His employees uniformly refer to the practice as "Boston Dental." *See Verified Complaint* ¶ 12. Similarly, all signage inside and outside the plaintiff's office, all correspondence sent to patients and vendors, and business and appointment cards given to existing and potential patients and others identify the plaintiff's practice as "Boston Dental." *See id.; Third Boustany Aff.* ¶ 6.

The plaintiff provides full-service dental care to patients at his single office in downtown Boston. *See Affidavit of Fred Boustany* ("*Boustany Aff.*") ¶ 4. Some 1,700 of his patients, however, live in the suburbs of Boston, and at least two hundred of such patients live in, or close to, suburbs in which BDG also has offices.[2] The plaintiff also serves some patients who reside in New Hampshire, Rhode Island, New York, and New Jersey. *See Verified Complaint* ¶ 7.

In January 1998, BDG began offering dental services under the name "Boston Dental Group," having incorporated as Boston Dental Group, Inc. in October 1997. *See Verified Complaint* ¶ 17; *Third Boustany Aff.* ¶ 15; *Affidavit of John T. Ward,*

---

1. The factual background recited here is derived from the verified complaint and affidavits filed by the parties. These background facts are supplemented as appropriate in other parts of this memorandum and order.

2. According to Boston Dental, twenty-four of its patients live in Lexington, Massachusetts, sixteen in Newburyport, Massachusetts, 145 in Watertown, Massachusetts, and thirty-six in Wellesley, Massachusetts. *See Third Boustany Aff., Exhibit A.*

*Jr.* ("*Ward Aff.*") ¶ 3. At present, BDG operates its offices in the suburban Boston communities of Wellesley, Concord, and Watertown, Massachusetts, and in the town of Newburyport, Massachusetts. *See Ward Aff.* ¶ 3. BDG also has related offices in Lexington, a Boston suburb, and in the town of North Dartmouth, Massachusetts. *See id.* BDG does not maintain an office in Boston; nor does it have any present plans to do so. *See id.*

Since BDG opened its offices, a number of the plaintiff's patients have inquired about appointments at one of Boston Dental's "suburban offices."[3] *See Affidavit of Damaris Ortiz* ¶ 3; *Affidavit of Sona Tacvorian* ¶ 2; *Affidavit of Hassan Irqsusi; Affidavit of Dia Mahaba; Affidavit of Sheila Torres; Second Affidavit of Damaris Ortiz.* Since June, 1998, such inquiries have averaged one each business day. *See Second Affidavit of Damaris Ortiz* ¶ 2. In addition, at least one of the plaintiff's employees labored under an initial impression that Boston Dental was affiliated with BDG when she interviewed with both practices. *See Affidavit of Lisa Wong, D.M.D.* ¶¶ 2–3.

In an affidavit submitted to the court in connection with the present motion, one of the principals of BDG says that the founders of BDG were aware of neither the plaintiff nor his practice under the "Boston Dental" mark when the founders chose the name "Boston Dental Group." *See Restated and Amended Second Affidavit of John T. Ward, Jr.* ("*Restated Second Ward Aff.*") ¶ 3. The founders chose the name in a brief meeting and did virtually no research to determine whether the mark was already in use. *See id.*

BDG markets its services to dental maintenance organizations ("DMOs") and has contacts with three such DMOs. *See Ward Aff.* ¶ 11(1). The plaintiff also derives significant revenues from DMOs. At present forty-one percent of such revenues come from patients who treat with Boston Dental through a DMO. *Third Boustany Aff.* ¶ 7.

### III. Discussion

■ To grant Boston Dental's request for a preliminary injunction, the court must find: "(1) that [Boston Dental] will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on [BDG]; (3) that [Boston Dental] has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir.1986) (citing *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981)). In cases involving trademark infringement, however, "the key issue is the likelihood of success on the merits because the other decisions will flow from that ruling." *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989) (citing *Trak Inc. v. Benner Ski, K.G.*, 475 F.Supp. 1076, 1078 (D.Mass.1979)). As one judge in this district has explained it, if there is a likelihood of success on the merits, "two consequences follow: (1) there will be a very strong likelihood that plaintiffs will suffer irreparable injury absent an injunction; and (2) the preliminary injunction will be found to be beneficial to the public interest." *Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F.Supp. 120, 122 (D.Mass.1996) (Gertner, J.) (citations omitted). Thus, the principal focus of this memorandum and order will be on whether it is likely that the plaintiff will succeed on his claims of trademark infringement under state and federal law.

### A. Likelihood of Success on the Merits

■ To make out a claim under § 1125 of the Lanham Act, the plaintiff must

---

3. A more detailed description of the incidents of confusion of the marks in the public mind appears below in the discussion of actual con- fusion of the marks. *See infra* section III. A.3(d). A precis of that evidence appears here.

prove the following things: "(1) the ownership of a distinctive mark entitled to trademark protection; (2) the use of that name in interstate commerce; and (3) its use by another in a manner likely to cause confusion as to the origin of the goods or services." *Calamari Fisheries, Inc. v. Village Catch, Inc.*, 698 F.Supp. 994, 1006 (D.Mass.1988) (citing *Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc.*, 561 F.Supp. 1014, 1019 (D.R.I.1983)). Reduced to the essentials, the central inquiry here is whether BDG's use of the plaintiff's mark is likely to cause consumer confusion.[4] *See, e.g., Stop & Shop*, 943 F.Supp. at 123.

### 1. Ownership of a Protected Mark

■ To determine whether the mark "Boston Dental" is protected by the Lanham Act, the court first must decide the category in which the mark belongs—that is, whether the mark is "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The protectability of a mark depends on the degree to which it can be said to distinguish the owner's products or services from those of another. The five categories just noted are used to classify marks by the degree to which they are distinctive. *Id.*

■ Categories (3) through (5) are inherently distinctive and thus entitled to protection. *See id.* A suggestive mark "connote[s] rather than describe[s] a particular product or service and require[s] the consumer's imagination to reach a conclusion as to the nature of the product or service." *Calamari Fisheries*, 698 F.Supp. at 1007 (citing *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 n. 8 (1st Cir.1980)). CHICKEN OF THE SEA

tuna is a suggestive mark. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th Ed.1998) § 11:72, at 11–121. An arbitrary mark is a mark made up of "those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *Id.* § 11:11, at 11–15. The STORK CLUB night club is an example of an arbitrary mark. *See id.* § 11:13, at 11–18. A "fanciful" mark is a mark made up of " 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." *Id.* § 11:5, at 11–11. CLOROX bleach, for example, is a "fanciful" mark. *See id.* § 11:8, at 11–13. The owner of a fanciful, arbitrary, or suggestive mark does not need to prove secondary meaning to achieve trademark protection. *See* 1 McCarthy §§ 4:2, 4:4, at 4–3, 4–4.

■ Generic and descriptive marks, by contrast, are not entitled to automatic trademark protection. Generic marks are "those that 'refe[r] to the genus of which the particular product is a species' " and thus are not protected. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753 (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)) (alteration in original). In addition "[m]arks which are merely descriptive of a product are not inherently distinctive." *Id.* at 769, 112 S.Ct. 2753. Thus, when they are used to describe a product, such marks are not entitled to protection. *See id.* Descriptive marks, however, can acquire "secondary meaning" and thus the distinctiveness that allows them to be protected under the Lanham Act. *See id.*

4. Likelihood of consumer confusion is also the relevant inquiry under the plaintiff's state-law claims. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 494 (1st Cir.1981) (explaining that likelihood of consumer confusion is important to the inquiry under Mass.Gen.L. ch. 110B); *Stop &*

*Shop*, 943 F.Supp. at 123 (explaining that the consumer confusion inquiry is " 'an essential element of a claim of trademark infringement,' whether it arises under state or federal law") (quoting *Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983)).

The mark "Boston Dental" is not suggestive, arbitrary, or fanciful, and the plaintiff does not argue to the contrary. The plaintiff contends instead that, although his mark may be descriptive, it is nonetheless protected, because the mark has acquired secondary meaning. *See Plaintiff's Memorandum*, at 6. BDG, on the other hand, argues that the "Boston Dental" mark is wholly unprotected under the Lanham Act because the mark is merely generic, *see Restated and Amended Affidavit of John T. Ward, Jr. ("Restated Ward Aff.")* ¶ 16, or because the plaintiff has failed to demonstrate secondary meaning in his "geographically descriptive mark." *See Defendant's Memorandum*, at 13.

The court's task then is to determine whether the mark is in fact generic, and thus afforded no protection by the Lanham Act, or whether it is descriptive, and thus possibly protected by the Act. BDG argues that the mark is merely generic because it is "composed of a geographic name and the word 'dental.'" *Restated Ward Aff.* ¶ 16. BDG's description of the mark, of course, is accurate in literal terms; and when a geographic term "is used merely to indicate the location or origin of goods and services," it is not protected because it is functioning in a purely descriptive manner. *See 2 McCarthy § 14:1, at 14–3.* But a geographic term can be distinctive and thus protected if it has acquired secondary meaning. *See id. § 14:9, at 14–16.* Thus,

the fact that the plaintiff's mark contains a geographic term does not ineluctably lead to the conclusion that the mark is merely generic and thus unprotected by the Lanham Act.[5] As McCarthy has explained, "A 'geographically descriptive term' is any noun or adjective that designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services." *See id. § 14:2, at 14–4.* The proper noun "Boston" in "Boston Dental" clearly designates a geographic location, and, unless there is secondary meaning attached to the mark, purchasers would tend to regard "Boston" as merely describing the location of the plaintiff's dental office.[6]

■ To find that the plaintiff's geographically descriptive mark has acquired secondary meaning, the court must determine that "the mark no longer causes the public to associate the [services] with a particular place, but to associate the [services] with a particular source." *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir.1993) (citing *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 595 (6th Cir.1989)). The following factors are relevant to that determination: "'(1) the length and manner of [the mark's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a con-

---

5. The RESTATEMENT (THIRD) OF UNFAIR COMPETITION describes generic designations in the following manner:

> A generic designation is a term that denominates a general type or class of goods, services, or business. Thus, 'camera' is a generic designation for a type of good, 'computer programming' for a type of service, and 'bank' for a type of business. A term that denominates a subcategory of a more general class, such as 'light' used with beer or 'diet' with cola, is also generic.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 15 cmt. a (1995). Under this formulation, putting aside the geographic aspect of the mark, "Boston Dental" is not merely generic. If the plaintiff's office were called "Dentist," it would certainly be "a term that denominates

a general type or class of services," like "computer programming." However, the plaintiff has combined a geographic term with the word "Dental," and, although this is not enough to make the mark anything more than descriptive, it does take it out of the generic category.

6. Examples of geographically descriptive marks include "MODESTO creamery," "BAVARIAN beer," and "CALIFORNIA apparel." *See 2 McCarthy § 14:9 n. 2* (citing *Modesto Creamery v. Stanislaus Creamery Co.*, 168 Cal. 289, 142 P. 845 (1914); *Anheuser–Busch, Inc. v. Bavarian Brewing Co.*, 264 F.2d 88 (6th Cir.1959); *California Apparel Creators v. Wieder of Cal.*, 162 F.2d 893 (2d Cir.1947)).

scious connection, in the public's mind, between that name or mark and a particular product or venture.'" *I.P. Lund Trading ApS v. Kohler Co.*, 11 F.Supp.2d 112, 120–21 (D.Mass.1998) (quoting *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 477–78 (5th Cir.1974)); *see also Boston Beer*, 9 F.3d at 182; *Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. 947, 952–53 (D.Mass.), *aff'd*, 70 F.3d 206 (1st Cir.1995); *Calamari Fisheries*, 698 F.Supp. at 1008.

The plaintiff has employed the "Boston Dental" mark since 1987, and his predecessor began using the mark in 1983. The use of the mark since 1983 has been continuous. *See Verified Complaint* ¶¶ 5–6. Over the years the plaintiff has spent $100,000 advertising and marketing the mark. *See Boustany, Aff.* ¶ 3. The plaintiff has used the mark to identify his services to existing and prospective patients, vendors, and the public at large. *See Verified Complaint* ¶¶ 9–10; *Third Boustany Aff.* ¶ 3–4. The mark has appeared on signage and the written and printed communications generated by the plaintiff. *See Verified Complaint* ¶¶ 5, 6, 10, 11. The telephones at Boston Dental are answered with a greeting that includes a reference to the mark, *see Third Boustany Aff.* ¶ 5, and the plaintiff is listed in local telephone directories under the name of "Boston Dental." *See Supp. Boustany, Aff.* ¶ 4.

All of this is evidence that the mark "Boston Dental" has achieved secondary meaning. There is other evidence as well. As noted in Section II of this memorandum and order, the record shows that a number of patients and at least one of the plaintiffs employees have confused the plaintiff's dental practice with that of BDG. This evidence of actual confusion is also strong evidence of secondary meaning. *See* 2 MᴄCᴀʀᴛʜʏ § 15:37, at 15–54.

The court is persuaded by all of the foregoing that the plaintiff is likely to succeed at trial in showing that the public has made the connection between the mark, "Boston Dental," and the services the plaintiff offers.

### 2. Interstate Commerce

 As explained above, to claim Lanham Act protection for his mark, the plaintiff must prove that the mark is used in interstate commerce. The Lanham Act has been construed to define "commerce" broadly: the use of "commerce" in the Act denotes a grant of jurisdiction "'at least as broad as the definition of commerce employed in any other federal statute.'" *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 838 (11th Cir.1983) (quoting *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 n. 3 (11th Cir.1983)). Moreover, if a plaintiff establishes that its business is interstate, there is no need for it to prove that the defendant's business is also interstate. *See id.* at 839; *Mother Waddles Perpetual Mission, Inc. v. Frazier*, 904 F.Supp. 603, 611 (E.D.Mich.1995).

The plaintiff has provided evidence, which BDG has not disputed, that the plaintiff serves many patients who live outside of Massachusetts, including patients who live in New Hampshire, Rhode Island, New York, and New Jersey. This extension of service to out-of-state patients is sufficient to establish the interstate commerce element of the plaintiff's Lanham Act claim. *See, e.g., Jellibeans, Inc.*, 716 F.2d at 838 (finding "interstate commerce" requirement met when skating rink drew patrons from one other state and "received some free publicity in national magazines"). The court finds, therefore, that the plaintiff is likely to succeed at trial in showing that his mark is used in interstate commerce.

### 3. Consumer Confusion

 The court now turns to the most important element of any Lanham Act claim-likelihood of consumer confusion. "The key element in any infringement action is likelihood of confusion." *Calamari*

*Fisheries,* 698 F.Supp. at 1009. To determine whether there is a likelihood of consumer confusion of two marks, the court must consider the following factors: (1) "the similarity of the marks"; (2) "the similarity of the goods"; (3) "the relationship between the parties' channels of trade"; (4) "the relationship between the parties' advertising"; (5) "the classes of prospective purchasers"; (6) "evidence of actual confusion"; (7) "the defendants' intent in adopting its mark"; and (8) "the strength of the plaintiff's mark." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981); *see also Keds Corp.,* 888 F.2d at 222 (citing *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29–34 (1st Cir.1989)); *I.P. Lund,* 11 F.Supp.2d at 122 (quoting *Pignons,* 657 F.2d at 487).

### a. Similarly of the Marks

■ When determining the similarity of two marks, a court should consider the "sight, sound and meaning" of the marks, *Calamari Fisheries,* 698 F.Supp. at 1009, but in the end the determination of whether the marks are similar should be based on " 'the total effect of the designation, rather than a comparison of individual features.' " *Pignons,* 657 F.2d at 487 (quoting *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444 (9th Cir.1980)).

Although the plaintiff has not offered much detail about the appearance of his mark, the total effect of the two marks is more than enough to show similarity. The only difference between the plaintiff's "Boston Dental" mark and BDG's "Boston Dental Group, Inc." is the addition of the words "Group, Inc." to BDG's mark. It is not surprising then that BDG has made no argument suggesting that the marks are not similar. The court finds that the plaintiff is likely to succeed at trial in showing similarity between his mark and that of BDG.

### b. Similarity of the Goods or Services

BDG's services are identical to those offered by the plaintiff: both parties provide dental services. *See Third Boustany Aff.* ¶ 2; *Ward Aff.* ¶¶ 4, 8, 11(2). But, even if the plaintiff and BDG did not offer precisely identical services, the "similarity of services factor" would weigh in the plaintiff's favor, so long as the plaintiff could show that many of the services of the two entities are similar or identical. *See Calamari Fisheries,* 698 F.Supp. at 1010 (noting that services were similar when plaintiff and defendant restaurants offered similar dishes, even though some dishes were only offered by one or the other). At trial, then, the plaintiff is likely to establish, at the least, substantial similarity between the services he offers and those offered by BDG.

### c. Channels of Trade/Advertising/Prospective Purchasers[7]

BDG's most strenuous argument is that the parties operate in different channels of trade, advertise differently, and offer services to different kinds of patients. As noted above, BDG's offices are located in various suburbs and other municipalities outside of Boston, while the plaintiff's single office is located in downtown Boston. From this, BDG argues that, because it "caters to patients in suburban locations between 12 and 60 miles from plaintiff's Boston office," its target market is markedly different from that of Boston Dental. *Defendant's Memorandum,* at 17.

The present record demonstrates, however, that the plaintiff's clientele is not limited to residents of Boston proper. The plaintiff also attracts suburban patients— nearly two thousand of them. *See Third Boustany Aff., Exhibit A.* Moreover, 221 of

---

7. The relationship between the parties' channels of trade, the relationship between the parties' advertising, and the classes of prospective purchasers are usually considered together. *See Pignons,* 657 F.2d at 488; *Copy Cop, Inc. v. Task Printing, Inc.,* 908 F.Supp. 37, 45 (D.Mass.1995).

the plaintiff's suburban patients live in or near Massachusetts cities or towns in which BDG maintains an office. *See id.* Thus, the fact that the plaintiff has a single downtown office and BDG has several suburban offices does little to weaken the force of the plaintiff's claim, supported by the record, that the channels of trade of the parties and the potential purchasers of their services are substantially similar.

BDG goes on to argue, however, that its target market is substantially different from that of the plaintiff because "BDG markets its services to providers of managed dental care." *Defendant's Memorandum,* at 16; *Ward Aff.* ¶ 11. According to BDG, the plaintiff "services few if any managed care DMO plans," and many of the patients that BDG sees through managed care plans could not use the plaintiff's services under their plans. *Id.*

The plaintiff counters, however, that he derives at least forty-one percent of his revenue from patients who come to Boston Dental through DMOs. *See Third Boustany Aff.* ¶¶ 7–8. According to the plaintiff, Boston Dental is a listed provider with a number of DMOs, including Prudential Insurance, the Boston Hotel Union, U.S. Healthcare, Aetna, Ameritas, Blue Cross, Cigna, Delta Dental, Harvard Community, Guardian, MetLife, Unicare, Preferred Travelers, The Massachusetts Public Employees Plan, and DMOs known by the acronyms DHA and IDOA. *See id.* ¶ 8. Thus, even if the relevant market were DMOs and other insurers, rather than individual patients, BDG's channel of trade and prospective purchasers are significantly similar to those of Boston Dental.

But BDG asserts that it specifically markets its services to DMO plan executives by "focus[ing its] advertising on direct contact with key executives of health insurance companies." *Ward Aff.* ¶ 13. BDG argues that these DMO executives are "sophisticated consumers" "who are unlikely to be confused by any similarity in names." *Defendant's Memorandum,* at 17. In support of this proposition, BDG offers letters from two managers of DMOs, who state that they have not been confused by the similarity of the two marks. *See Third Affidavit of John T. Ward, Jr. ("Third Ward Aff."), Exhibits A & B.*

The difficulty for BDG, however, lies in the fact that merely because two executives have not been confused by the similar marks does not mean that the public as a whole will not be confused. Indeed, as will be discussed in some detail below in section III. A.3(d), employees of "sophisticated" insurance carriers have, in fact, confused BDG and Boston Dental.

In the larger sense, however, confusion, or lack of confusion, among DMO executives is quite beside the point. Irrespective of BDG's marketing strategy (which appears to be directed to assuring that BDG is a provider of dental services listed in the directories that various DMOs make available to their subscribers), the ultimate and critical consumer choice about what service to use rests with individual patients—those who would seek out Boston Dental or BDG for dental care. The plaintiff and BDG are both providers for several of the same DMOs. Thus, patients who are subscribers of these DMOs are faced with a choice among a variety of dental-care providers, including two, Boston Dental and BDG, that have substantially similar marks. In such circumstances, the likelihood of confusion is obvious.

For all of the reasons set forth in this subpart of this memorandum and order, the court finds that the plaintiff has demonstrated a likelihood that he can show, as between himself and BDG, a significant similarity in the channels of trade and prospective purchasers of dental service.

BDG argues, however, that the parties employ different advertising and marketing schemes. As explained above, BDG focuses its advertising on direct contact with executives of DMOs. *See Defendant's Memorandum,* at 17; *Restated Ward Aff.* ¶ 13. According to BDG, it has spent ap-

proximately $2,000 on this kind of advertising. *See id.*

As noted above, the plaintiff has apparently focused most of his marketing in other forms of advertising—e.g., signage, business cards, flyers, and mailers. The plaintiff asserts persuasively, however, that he and his colleagues have also advertised directly to insurers, meeting frequently with representatives of DMOs. *See Third Boustany Aff.* ¶¶ 10–11. It thus appears that the plaintiff is likely to be able to show at trial at least some overlap between the targets of his advertising and those of BDG. But even if the overlap is not substantial, the plaintiff is likely to be able to show that the parties share an identical advertising goal, namely increasing the number of individual patients each serves.

### d. Evidence of Actual Confusion

█ "Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion. Actual confusion is such persuasive evidence of the likelihood of confusion that even a minimal demonstration of actual confusion may be significant." *Copy Cop Inc. v. Task Printing, Inc.*, 908 F.Supp. 37, 45 (D.Mass.1995) (internal citations omitted).[8] As noted above, in connection with the discussion of whether the plaintiff's mark has acquired secondary meaning, *see supra* section III.A.1, the plaintiff has produced substantial anecdotal evidence of actual confusion. Because actual confusion is so significant as evidence of the likelihood of confusion, the court will consider the plaintiff's evidence in some detail, even at the risk of referring again to evidence previously discussed.

The plaintiff has submitted several affidavits describing actual confusion of the two marks at issue in this case. The plaintiff's front office manager, Damaris Ortiz, says that she has received numerous telephone calls from patients and prospec-

tive patients requesting appointments at Boston Dental's "new offices" in Watertown and Wellesley. *See Affidavit of Damaris Ortiz* ¶ 3. Boston Dental does not have offices in these areas; BDG does. Ms. Ortiz also says that Boston Dental has received at least one call each day since June 1998 from patients requesting that they be seen at one of Boston Dental's "suburban offices." *See Second Affidavit of Damaris Ortiz* ¶ 2. Boston Dental has no suburban office; BDG does. Ms. Ortiz also describes a telephone conversation that she had with an employee of Prudential Insurance. *See id.* ¶ 6. The Prudential employee asked if Ms. Ortiz was calling from the "Boston Dental in Watertown or the Boston Dental in Boston." *See id.*

The plaintiff's receptionist, Sheila Torres, in her affidavit also recounts stories of two patients who wanted to receive the plaintiff's services from the plaintiff's "Wellesley Office." *See Affidavit of Sheila Torres.* Similarly, two of Boston Dental's dentist-employees describe patient requests to be seen at "Boston Dental's suburban offices" in Watertown, Wellesley, Concord, and Newburyport. *See Affidavit of Sona Tacvorian, D.M.D.* ¶ 2; *Affidavit of Dia Mahaba.* One of the plaintiff's patients submitted an affidavit in which the patient describes seeing a sign for "Boston Dental GP" in Watertown, advertising a teeth-whitening discount. *See Affidavit of Hassan Irqsusi* ¶ 1–2. The patient telephoned Boston Dental, asked about the discount, and was told that the two dental offices were not affiliated. *See id.* ¶ 3. Before this conversation took place, the patient "had believed that Boston Dental GP in Watertown and the Boston Dental in Boston were part of the same practice." *Id.* ¶ 4.

In addition to affidavits describing the confusion of third parties, the plaintiff has submitted affidavits from two of his own employees, relating how they confused the

---

**8.** A plaintiff, however, is not required to show actual confusion to succeed on a trademark-

infringement claim. *See Calamari Fisheries*, 698 F.Supp. at 1011.

practice of BDG with that of the plaintiff. One employee-dentist explains that she was not sure if there was a relationship between Boston Dental and the new BDG offices until she spoke with the plaintiff, who explained that there was no relationship. *Affidavit of Sona Tacvorian, D.M.D.* ¶ 3. Another dentist-employee explains that, after meeting with one of the principals of BDG, she believed that Boston Dental and BDG were affiliated, until she interviewed with the plaintiff's practice. *See Affidavit of Lisa Wong, D.M.D.* ¶ 2–3.

The foregoing anecdotal evidence of actual confusion of the marks may not alone make the case for likelihood of confusion, but at this stage of the proceedings such evidence is potent enough in that regard significantly to enhance the assessment of the plaintiff's chances of success at trial on the confusion issue.

### e. BDG's Intent in Adopting Mark

The plaintiff has not produced persuasive evidence that, in adopting "Boston Dental Group, Inc." as its mark, BDG intended to create confusion. The verified complaint merely alleges "on information and belief" that the principals of BDG chose their mark "to usurp the good will" of Boston Dental. *See Verified Complaint* ¶ 22. In contrast, BDG asserts that its principals selected the name "Boston Dental Group, Inc." without knowledge of the plaintiff or his practice, and that they did no research with respect to whether another dental care provider was already using the name. *See Second Restated Ward Aff.* ¶ 3. Given this state of the record, the court finds that the plaintiff will not likely succeed in proving at trial that BDG chose its mark with the intention of appropriating to itself goodwill established by Boston Dental.

### f. Strength of Plaintiff's Mark

The final factor to be considered in the consumer-confusion analysis is the strength of the plaintiff's mark. "Boston Dental" is a descriptive mark, and descriptive marks are generally considered weak marks. *See Calamari Fisheries,* 698 F.Supp. at 1013. Strength of the. mark, therefore, like the evidence as to BDG's intention in adopting its mark, favors BDG.

Notwithstanding the relative weakness of his mark and the scarcity of evidence that BDG was motivated by a dark design in adopting a competing mark, the plaintiff has offered abundant evidence of a likelihood of confusion. He has shown substantial similarity between the two marks themselves, significant similarity between the services offered by the parties, a similarity in the parties' channels of trade, advertising, and prospective purchasers, and finally, and perhaps most importantly, evidence of actual confusion. The court therefore finds that the plaintiff is likely to succeed at trial in proving that BDG's use of its mark creates a likelihood of confusion.

### B. Irreparable Harm

Because Boston Dental has demonstrated a likelihood of success on the merits, irreparable harm will be presumed. "Under First Circuit law, irreparable harm may be shown even in the absence of evidence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim of trademark infringement." *Calamari Fisheries,* 698 F.Supp. at 1013; *see also Donoghue,* 886 F.Supp. at 954.

### C. Balance of Harms

In weighing the balance of harms resulting from the granting or denial of a preliminary injunction in a trademark infringement case, the court proceeds from the proposition that "[h]arm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms. The Court is to consider the potential legitimate harm to the defendants owing to the

injunction as balanced against the degree of plaintiff's likelihood of success on the merits." *Robert J. Fritz, DMA, Inc. v. Arthur D. Little, Inc.,* 944 F.Supp. 95, 97–98 (D.Mass.1996) (internal citations omitted).

As a preliminary matter, BDG argues that Boston Dental has lost its presumption of irreparable harm because it delayed for eight months any effort to redress the claimed infringement. *See Defendant's Memorandum,* at 18. BDG may be correct, at least under cases decided in the Second Circuit, that delay can lead to the loss of the presumption of irreparable harm. As the court in *Museum Boutique Intercontinental, Ltd. v. Picasso* explained: " 'Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.' " 880 F.Supp. 153, 164 (S.D.N.Y.1995) (quoting *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985) (per curiam)). The question, therefore, is whether any delay of the plaintiff in seeking relief from BDG's alleged infringement was a "significant delay." The court answers the question in the negative.

In *Museum Boutique* and in *Majorica,* upon which *Museum Boutique* relies, the delay was much greater than any delay in the present case. In *Museum Boutique,* the plaintiff had known of the alleged infringer's use of the plaintiff's mark for approximately *fourteen years.* 880 F.Supp. at 164. In *Majorica,* the plaintiff knew of the allegedly infringing conduct for "*several year*" before filing for preliminary injunctive relief. 762 F.2d at 8. Furthermore, the *Majorica* plaintiff waited seven months between filing its complaint and requesting a preliminary injunction. *See id.*

By contrast, the plaintiff here at most waited eight months between the time he learned of BDG's use of its mark and the time he instituted suit. Moreover, the plaintiff was not indolent or passive in the interim. During the eight months preceding this action, the plaintiff had meetings with his staff, sought advice from counsel, and began a course of what he calls "cease and desist" communications to BDG. *See Third Boustany Aff.* ¶ 15; *Affidavit of Thomas E. Kenney,* ¶¶ 2–4. The first "cease and desist" letters were sent to BDG within a month of the plaintiff's discovery of BDG's use of the competing mark. Thereafter, plaintiff's counsel unsuccessfully tried to reach BDG's counsel by telephone and by subsequent written correspondence. *Id.* After filing his complaint, the plaintiff waited only one month before applying for preliminary injunctive relief. Given this history, the plaintiff has not, by reason of delay, forfeited his presumption of irreparable harm.

BDG next claims that the issuance of an injunction in this case "would have devastating and potentially fatal consequences for Boston Dental Group, Inc.'s business." *Restated Ward Aff.* ¶ 14. BDG avers that the costs of changing its letterhead, signage, and advertising, of reincorporating under a new name, and of renegotiating contracts with insurance carriers could amount to "tens of thousands of dollars." *Id.* ¶ 14(A). No further specificity as to the amount of such costs is offered. Moreover, BDG has presented no evidence demonstrating how it arrived at even this imprecise estimate of costs. BDG's case on the costs it will incur if an injunction is issued is at best built on guesswork.

Beyond the assertion that the costs identified above would run into the "tens of thousands of dollars," BDG claims that it would suffer "incalculable damages" if it were to change its name, because it would no longer be viewed as a "stable company" by insurers and potential patients. *See Restated Ward Aff.* ¶ 14(B). BDG explains that two of its offices were purchased from another dental group that has since filed for bankruptcy relief. *See id.* BDG asserts that the bankruptcy has already cre-

ated an uncertainty in BDG's business, which would be exacerbated by a name-change. Such uncertainty, BDG claims, could result in BDG's own bankruptcy. *See id.* Again, BDG offers no evidence, beyond these conclusory assertions and speculations, to support these claims.

Because BDG has offered no evidence supporting its various assertions of costs it would incur and damages it would sustain should a preliminary injunction issue, the court finds that the possibility of harm to the plaintiff, in light of his showing of a likelihood of success at trial, has not been displaced. Thus, the court holds that the balance of harm weighs in the plaintiff's favor.

*D. Public Interest*

■ In copyright and trademark cases, the public interest almost always favors the granting of otherwise "appropriate injunctions." *Robert J. Fritz, DMA,* 944 F.Supp. at 97 (citing *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir.1988)). "[T]he relevant consideration is the consumers' interest in not being deceived or confused about the products they purchase. Preventing consumer confusion is clearly in the public interest." *Calamari Fisheries,* 698 F.Supp. at 1015 (internal citations omitted). These principles guide the assessment of the public interest factor in the present case. The plaintiff has demonstrated the likelihood of consumer confusion, and that showing is enough to place the weight of public interest concerns in favor of granting the injunction.

Accordingly, the court orders as follows:

1. Pending a final determination of the issues in this case, the defendant, Boston Dental Group, Inc., its officers, agents, servants, employees and attorneys are enjoined and restrained from identifying themselves or dental services they provide in Massachusetts by use of any name that contains the term "Boston Dental," alone or in combination with any other term;

2. The injunction hereby issued shall be effective immediately. BDG shall take immediate steps to remove from all signage, advertising, letterheads, invoices, checks, stationery, and other documents used in its business in Massachusetts any information that identifies it by use of any name that contains the term "Boston Dental," alone or in combination with any other term;

3. BDG shall take immediate steps to notify insurance carriers, in whose Massachusetts provider directories BDG is listed, that BDG and the services it provides may not be identified in such directories by any name that contains the term "Boston Dental," alone or in combination with any other term;

4. The plaintiff Fred G. Boustany, D.M.D., d/b/a Boston Dental, shall post a bond in the amount of $25,000 as security for any costs that may be incurred by the defendant should any court later determine that the injunction hereby issued was inappropriately granted.

SO ORDERED.