**MONTBLANC–SIMPLO GMBH and Montblanc, Inc., Plaintiffs,**

**v.**

**STAPLES, INC., Defendant.**

**No. Civ.A. 01–10235–DPW.**

United States District Court,
D. Massachusetts.

May 3, 2001.

Ronald G. Dove, Jr., Charles E. Buffon, Covington & Burling, Washington, DC,

Thomas V. Urmy LLP, Boston, MA, for Plaintiffs.

Steven M. Cowley, Robert D. Laurie, Edwards & Angell, Boston, MA, Michael D. Albert, Wolf, Greenfield & Sacks, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

The plaintiff is the manufacturer of high quality and highly priced writing instruments. The defendant is an office supply superstore chain that sells the plaintiff's instruments in an altered form, having purchased them from a distributor that purchases overseas and then scrapes off the serial numbers and a certain trademark. The plaintiff seeks a preliminary injunction under trademark law, barring the defendant from selling the altered instruments. The defendant contends that at most notice—which it contends it already provides—is sufficient to remedy any trademark problems. Finding that there is a substantial likelihood of success for plaintiff's trademark dilution claims, I will bar the defendant from selling plaintiff's instruments if the serial number and the mark have been scraped off and I will also require that the notice defendant provides be strengthened.

## I. BACKGROUND

### A. The Parties

Montblanc–Simplo is a German corporation with its principal place of business in Hamburg, Germany. It designs, manufactures, and packages Montblanc writing instruments solely outside the United States and its territories. Montblanc writing instruments bear a number of trademarks registered by the United States Patent and Trademark Office. These trademarks include: "Montblanc" (Reg. No. 776,208); a stylized star design (Reg. No. 839,016) and a gold three-ring design (Reg. Nos. 1,891,033 and 1,723,665) on the cap of each writing instrument (Reg. Nos. 1,891,033 and 1,723,665). Recently, the word "Pix" has been introduced as a trademark. (Reg. Nos. 2,087,771 and 624,087).

Montblanc, Inc. is a New Jersey corporation with its principal place of business in Bloomsbury, New Jersey. Montblanc, Inc. is a wholly owned subsidiary of Montblanc–Simplo and is the exclusive authorized distributor in the United States of Montblanc writing instruments. (Martens Decl. ¶ 8.)

Staples is a Delaware corporation with its principal place of business in Massachusetts located at 500 Staples Drive, Framingham, Massachusetts. Staples sells office products through the operation of "superstores," as well as through catalogs and the internet. Staples does not currently advertise or sell Montblanc writing instruments over the internet or in catalogs; they are available only in its retail stores. (Knutrud Aff. ¶ 3.)

### B. Factual History

Montblanc–Simplo alleges that, with the exception of duty-free shops not engaged in United States commerce, it has neither licensed nor authorized any person or entity other than Montblanc to import or distribute Montblanc writing instruments in the United States. Montblanc distributes Montblanc writing instruments to a "limited number of select upscale retailers and jewelers." (Martens Decl. ¶ 9.)

Staples has sold Montblanc writing instruments in its stores for approximately ten years. (Knutrud Aff. ¶ 2.) Staples does not purchase Montblanc writing instruments directly from Montblanc; rather its principal supplier of Montblanc products is Virginia Commonwealth Trading Co. ("VCTC"). VCTC imports Montblanc products from Europe, and removes the serial numbers and Pix trademarks before selling the products to Staples. (Knutrud Aff. ¶¶ 2, 8.) VCTC supplies similar Mont-

blanc writing instruments to OfficeMax and Office Depot. According to Staples, Montblanc writing instruments with the serial numbers removed are also available from other suppliers. (Knutrud Aff. ¶¶ 2, 8.)

In 1996, Montblanc brought a copyright infringement action against Staples after learning that Staples was selling Montblanc writing instruments in Montblanc's copyrighted box. Under the terms of the resulting settlement agreement, Staples agreed to refrain from selling "packaging, warranty and service material bearing the 'Montblanc Design.'" (Knutrud Aff. Ex. C.) The agreement did not extend to Staples' sale of the writing instruments themselves because the action concerned only Montblanc's copyrighted box. (Martens Decl. ¶ 6.)

In August 1997, Montblanc sought to record its Pix trademark with the U.S. Customs Service for the purpose of obtaining protection against counterfeit and gray market imports. (Martens Decl. ¶ 7.) Montblanc subsequently learned that VCTC was shipping Montblanc products to a foreign trade zone, removing the serial numbers and Pix marks, and then importing the products into the United States. (Id.) In response to Montblanc's complaint about VCTC's practices, the Customs Service on March 26, 1998 issued an opinion letter permitting these practices to continue. (Id.)

Montblanc then contacted Staples directly and offered to let it sell certain Montblanc pens if it agreed to stop selling certain other Montblanc pens. Staples refused and no agreement was reached. (Martens Decl. ¶ 8.)

In February 2000, Montblanc began placing the Pix mark in a "prominent position in the exterior gold rings at the base of the pen cap." (Martens Decl. ¶ 9.) In December of 2000, Montblanc found for the first time writing instruments offered for sale by Staples with both the serial numbers removed and the Pix mark removed from the rings on the pen cap. (Id. ¶ 10.)

On December 20, 2000, Montblanc's counsel sent a "cease-and-desist" letter informing Staples that its sale of altered Montblanc writing instruments infringed Montblanc's trademarks, and that any future sales would constitute willful infringement. (Supp. Martens Decl. ¶ 3.) Staples continued to sell Montblanc writing instruments in its stores after receiving the letter.

On February 8, 2001, Montblanc filed suit against Staples. Upon learning that OfficeMax and Office Depot were selling similarly altered Montblanc writing instruments, Montblanc also filed actions against them. *See Montblanc–Simplo GmbH v. OfficeMax, Inc.*, No. 00–447 (N.D.Ohio Feb. 26, 2001); *Montblanc–Simplo GmbH v. Office Depot, Inc.*, No. 01–1040 (S.D.Fla. Mar. 15, 2001). Thereafter Montblanc pressed in this court to have its preliminary injunction motion heard.

## II. ANALYSIS

The First Circuit traditionally uses a four-part test to determine whether a preliminary injunction should issue. Under that test, a court must consider: (A) whether the plaintiff has demonstrated a likelihood of success on the merits; (B) whether the plaintiff will suffer irreparable harm if the injunction is not granted; (C) whether the harm to the plaintiff outweighs any harm which granting the injunction will impose on the defendant; and (D) whether the public interest will be adversely affected by the granting of the injunction. *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir.1995) (citations omitted); *see also Boustany v. Boston Dental Group, Inc.*, 42 F.Supp.2d 100, 104 (D.Mass.1999). The

key issue, with respect to preliminary injunctions sought in trademark cases, is whether the plaintiff has demonstrated a likelihood of success on the merits. *Id.*

## A. Likelihood of Success on the Merits

Montblanc brings this action under several provisions of the Lanham Act: § 32(1), 15 U.S.C. § 1114(1)(a),[1] for trademark infringement; § 43(a), 15 U.S.C. § 1125(a),[2] for unfair competition and misrepresentation; and § 43(c), 15 U.S.C. § 1125(c),[3] for trademark dilution.[4] Under each of these provisions, "the touchstone of liability is the same—namely, a likelihood of consumer confusion as to the source of the goods." *John Paul Mitchell Systems v. Pete–N–Larry's Inc.,* 862 F.Supp. 1020, 1023 (W.D.N.Y.1994) (citations omitted). Thus, to prevail under the Lanham Act, Montblanc must show that Staples' unauthorized sale of goods bearing Montblanc's registered trademark is likely to result in consumer confusion. *See Original Appa-*

*lachian Artworks, Inc. v. Granada Elecs., Inc.,* 816 F.2d 68, 71 (2d Cir.1987), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987); 15 U.S.C. §§ 1114(1)(a); 1125(a).

### 1. *Legal Framework*

Two general principles underlie the Lanham Act. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 636 (1st Cir.1992). First, the Act focuses on protecting consumers from confusion, because "[e]very product is composed of a bundle of special characteristics," and the consumer, in purchasing that product, "expects to receive those special characteristics on every occasion." *Nestle,* 982 F.2d at 636; *see also Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 619 (9th Cir.1993) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 2764 n. 15, 120 L.Ed.2d 615 (1992)) (purpose of trademark protection is to ensure that the public "will get the product which it asks

---

1. Section 32(1) states in relevant part:
 (1) Any person who shall, without the consent of the registrant -
 (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.
 15 U.S.C. § 1114(1)(a).

2. Section 43(a)(1) of the Lanham Act, prohibiting unfair competition, provides in pertinent part:
 Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to

the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 15 U.S.C. § 1125(a)(1).

3. Section 43(c) provides that the trademark owner is entitled to an injunction against another person's commercial use of the trademark "if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c)(1).

4. The plaintiff also asserts parallel claims under Massachusetts law for common law trademark infringement; unfair competition under Mass. Gen. Laws ch. 93A §§ 2, 11; and trademark dilution under Mass. Gen. Laws ch. 110B § 12. Only the federal claims have been briefed on the preliminary injunction motion.

for and wants to get"). Second, the Act seeks to protect the trademark owner's goodwill and his "ability to shape the contours of his reputation." *Id.*

■ Under the "first sale" doctrine, the trademark protections of the Lanham Act as to a particular item are exhausted after the trademark owner's first authorized sale of that individual product. *See Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 301 n. 4 (3d Cir.1998) (citing *Sebastian Int'l v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1076 (9th Cir.1995) ("The 'first sale' rule is not rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer.")). Thus, as a general rule, trademark law does not "reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent." *Nestle,* 982 F.2d at 638 (citations omitted); *see also Nexxus Products Co. v. CVS New York, Inc.,* 188 F.R.D. 11, 15 (D.Mass.1999). In other words, the fact that a subsequent sale is unauthorized by the trademark owner does not give rise to an infringement claim where the product is identical to the product sold pursuant to an authorized channel. *See Nestle,* 982 F.2d at 641; *see John Paul Mitchell Systems,* 862 F.Supp. at 1023.

■ In the context of gray market goods,[5] the Supreme Court has long recognized the territoriality of trademark rights, which serves to protect domestic trademark holders against gray market imports. *See Nestle,* 982 F.2d at 637 (citing *A. Bourjois & Co. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923); *A. Bour-*

*jois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923)). As the First Circuit has explained, "territorial protection kicks in under the Lanham Act where two merchants sell physically different products in the same market and under the same name, for it is this prototype that impinges on a trademark holder's goodwill and threatens to deceive consumers." *Nestle,* 982 F.2d at 637 (citation omitted).

■ Where altered goods are concerned, the sale of gray market products may be found to violate the Lanham Act if the products (1) were not intended to be sold in the United States and (2) are materially different from the goods authorized for sale in the United States market. *Helene Curtis v. Nat'l Wholesale Liquidators, Inc.,* 890 F.Supp. 152, 158 (E.D.N.Y.1995) (citing *Nestle,* 982 F.2d at 638; *Original Appalachian Artworks,* 816 F.2d at 72–73). The First Circuit has held, in the context of a gray market goods case, that the "pivotal determinant" of Lanham Act infringement under both § 32 and § 43(a) is the presence of physical or other "material differences" likely to confuse consumers between the goods. *Nestle,* 982 F.2d at 639–40; *see also Iberia Foods Corp.,* 150 F.3d at 302–03 (citations omitted) ("trademark owner attempting to use § 32 to prevent an infringement must establish that the products sold by the alleged infringer are not 'genuine'" by showing that "material differences" exist between the products); *Original Appalachian Artworks,* 816 F.2d at 73 (existence of material difference that created confusion was most important in finding infringement by

---

**5.** A gray market good is a "foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.,* 112 F.3d 1296, 1299 n. 2 (5th Cir.1997) (quoting *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 285, 108 S.Ct.

1811, 100 L.Ed.2d 313 (1988)); *see also Nestle,* 982 F.2d at 635 (defining gray market products as trademarked goods manufactured abroad but "brought into this country in derogation of arrangements lawfully made by the trademark holder to ensure territorial exclusivity").

gray market products); *John P. Mitchell Systems*, 862 F.Supp. at 1023. A showing of actual consumer confusion is not required; for the mere showing of a "material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law." *Nestle*, 982 F.2d at 640 (citations omitted).

### a. *Material Differences in General*

■ The First Circuit has defined a "material" difference broadly to encompass "any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product." *Nestle*, 982 F.2d at 641. Because "it is by subtle differences that consumers are most easily confused," the First Circuit has instructed that "the threshold of materiality must be kept low enough to take account of potentially confusing differences—differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations." *Nestle*, 982 F.2d at 641.

The flavor of what is considered a "material difference" so as to constitute a violation of the Lanham Act can be captured by a brief taste of the facts in certain gray market cases.

In *Nestle*, the First Circuit reversed the District Court and ordered injunctive relief to the owner of the United States trademark for Italian-made Perugina chocolates against the parallel importation of Venezuelan-made Perugina chocolates. 982 F.2d at 644. The appellate court identified numerous differences between the competing products, including: the composition of the chocolate, the packaging, the price, and the conditions under which the chocolates were shipped and stored. *See id.* at 642–43. These differences were deemed "material" by the First Circuit and therefore the "use of the same Perugina label on chocolates manifesting such differences is presumptively likely to cause confusion." *Id.* at 644.

In *Original Appalachian Artworks*, the Second Circuit affirmed an injunction granted to the owner of the United States trademark for Cabbage Patch Kids dolls against an importer who had purchased Cabbage Patch Kids dolls manufactured in Spain under license from the trademark owner. 816 F.2d at 70. Although the Spanish dolls were "genuine," the court found sufficient material differences—adoption papers and birth certificates printed in Spanish and the inability of consumers to "adopt" the Spanish dolls—so as to create potential consumer confusion and harm to the domestic trademark owner's goodwill. *Id.* at 73.

In *Martin's Herend Imports*, the Fifth Circuit affirmed an injunction enjoining the parallel importation of Hungarian Herend porcelain dolls. 112 F.3d at 1302. The alleged infringer sold Herend items not offered by the United States trademark owner, which the court deemed a material difference, "since consumer choices for such artistic pieces are necessarily subjective or even fanciful, depending on each consumer's personal artistic tastes." *Id.* at 1302.

In *John P. Mitchell Systems*, the trademark claims against the defendant retailers who sold Paul Mitchell products without batch codes, allegedly the only means for the plaintiff to recall defective products, survived the retailers' motions to dismiss and for summary judgment. 862 F.Supp. at 1026. The batch codes were obliterated by a physical chiselling away of the bottle's surface that resulted in scarring of the bottles and in many cases also erased information printed on the bottles. *Id.* The court also specifically noted that one bottle had been punctured as a result

of the removal of its batch code, which caused leakage of the bottle's contents. *Id.* The court found that retailers' obliteration of batch codes created a material difference between the manufacturer's products and those sold by the retailers. *See id.* at 1027. Although Paul Mitchell had never actually recalled any of its products, the court found that removal of the batch codes adversely impacted its ability to do so, stating that "it is the right to control the quality—as well as the actual quality—that is afforded one of the most important protections under the Lanham Act." *Id.* at 1026.

### b. *Existence of Material Differences Here*

Staples does not dispute that the Montblanc writing instruments it sells were not intended to be sold in the United States. *See Helene Curtis,* 890 F.Supp. at 158. Nor, in light of Montblanc's exclusive authorized United States distributor and selective retail sales strategy, does Staples contend that it was an authorized seller of Montblanc products. Thus, the critical inquiry in determining whether Montblanc has a likelihood of success on the merits is whether material differences exist between the gray market products sold by Staples and the authorized Montblanc products sufficient to create the likelihood of consumer confusion. *See Nestle,* 982 F.2d at 640.

Montblanc alleges that Staples is selling Montblanc writing instruments that have been scarred and altered so as to create a physically and materially different product. These alterations include:

1. Obliteration of the serial number from the gold-plated band anchoring the clip to the writing instrument.

2. Obliteration of the Pix trademark from the gold-plated clip.

3. Obliteration of the Pix trademark from the gold-plated central band.

4. Obliteration of the Pix trademark from the refill ink cartridge.

5. Removal of the Montblanc owner's manual/warranty certificate.

### i. *Appearance*

Montblanc contends that obliteration of serial numbers and Pix trademarks leaves visible scars on the writing instruments sold by Staples, but acknowledges that these scars are evident only upon close examination. Staples responds that the removal is "virtually undetectable, such that the writing instruments continue to appear to consumers as high quality products, not 'seconds' of shoddy workmanship." Staples also argues that (1) even if not removed, the serial numbers are visible only with great effort; (2) the Pix mark hidden behind the clip is not visible; and (3) removal of the Pix mark on the central band does not cause confusion given that not all Montblanc writing instruments sold by authorized retailers have a Pix mark on that band.[6] (Hill Aff. ¶¶ 7–8.)

Montblanc has submitted several photographs of its products after the serial numbers and Pix marks have been removed. (Palin Decl. Exs. 13–14.) Exhibit 14A is a photograph of a Montblanc pen that was purchased on February 9, 2001 from the Staples located at 335 Washington Street. (Palin Decl. Ex. 14A.) From the photograph, the obliteration of the Pix mark on the gold central band on the cap is clearly visible. The other photographs reflect scarring on the underside of the pen clip and on the ink cartridge, both of which are

---

6. Montblanc reports that it only began placing the Pix mark on the central band at the base of the pen cap as of February 2000. This, it argues, is why Montblanc writing instruments in the inventory of authorized retailers do not all bear that mark. (Martens Decl. ¶ 9; Hill Aff. at ¶ 8.)

presumably much less noticeable to consumers. (Palin Decl. Exs. 14B–14D.) At the hearing in this matter, I examined examples of altered and unaltered instruments and found the alterations evident upon the close examination owners and recipients of quality articles give to such products.

ii. *Product Integrity*

Montblanc also contends that obliteration of the serial numbers and Pix trademarks compromises product integrity, because it removes heavy gold electroplating from the clip ring and clip, and gold plating from the central band, making these parts "highly prone to corrosion." (Voss Decl. ¶ 7.) Additionally, Montblanc contends sufficient gold is removed from the product in some areas so that "in most instances the writing instrument may no longer be accurately described as 'gold-plated' in these areas." (Voss Decl. ¶ 7.) Citing *Nestle*, 982 F.2d at 642, 644, Montblanc argues that even small differences in the chemical composition of a product that may not be readily apparent to consumers can be "material."

According to Staples, VCTC replaces the gold plating after it removes the serial numbers and Pix marks. (Knutrud Aff. at ¶ 12.) Staples also asserts that Montblanc has produced no evidence regarding the standard range of gold plating thickness, how that thickness is affected by the initial engraving, or the standard rate of deterioration of gold plating associated with normal wear and tear.

Horst Voss, Technical Director of Montblanc–Simplo GmbH, examined several separate shipments of altered Montblanc writing instruments received from Montblanc's attorneys. (Voss Decl. ¶¶ 1, 5.) He states that Montblanc's standard layer thickness for heavy gold electroplating (on the clip ring and clip) is 3.6 microns, whereas the thickness of coating on the

clips where the Pix mark had been removed was as follows:

Sample No. 1—too thin to measure

Sample No. 5—0.036 microns

Sample No. 9—0.09 microns

(Voss Decl. ¶ 8.)

According to Voss, the standard layer thickness for the gold on the central band is 12 microns. Voss examined four pens where the Pix mark had been removed from the central band (sample nos. 8, 10, 11, 12). (Voss Decl. ¶ 9.) On three of the pens, Voss found no gold at all in the portion where the Pix mark was removed, and on the fourth pen, he found that the relevant area had been painted over with yellow paint. (*Id.*)

iii. *Quality Control*

Montblanc asserts that genuine Montblanc writing instruments bear a serial number allowing Montblanc to identify the date on which the product was manufactured and to whom it was distributed. (Martens Decl. ¶ 5.) These serial numbers are "a vital part of Montblanc's quality control efforts; without them, Montblanc is unable to implement its quality control regime." (Voss Decl. ¶ 4.) Montblanc alleges that, because the serial numbers have been removed from the altered Montblanc writing instruments sold by Staples, the products cannot be recalled if manufacturing errors are discovered and cannot be identified if lost or stolen. (Martens Decl. ¶¶ 13–14.)

Staples asserts that Montblanc has failed to identify a single product recall in which Montblanc had to utilize serial numbers on its writing instruments for quality control purposes. However, as the *John P. Mitchell Systems* court found, the absence of any actual recalls "does not necessarily negate the plaintiffs' assertion that they had been maintaining their ability to

recall as an integral part of their quality control effort protected by the Lanham Act." 862 F.Supp. at 1026.

### iv. *Warranty and Owner's Manual*

A "Service Guide" manual, containing instructions on cleaning and operating the writing instrument, a full description of the warranty and guarantee, and a warranty certificate, accompanies each authentic Montblanc writing instrument. (Martens Decl. ¶ 4.) Removal of the manual, Montblanc contends, will increase the likelihood that consumers will not be able to clean or operate their writing instruments properly. (Martens Decl. ¶ 10.) Furthermore, Montblanc argues, as a result of removal of the warranty, purchasers receive a Staples warranty that is "materially inferior to Montblanc's one-year unconditional warranty good for repair or replacement of the product if the product bearing its serial number is sent to Montblanc from anywhere in the world."[7] (Montblanc Mem. at 6–7.) Montblanc, however, adduced no evidence demonstrating substantive inferiority in the Staples warranty.

Staples responds that, because Montblanc's warranty does not apply to any writing instruments sold by Staples, removal of the warranty pamphlet actually *avoids* consumer confusion. Moreover, Staples does not provide Montblanc's service manual at Montblanc's own insistence, pursuant to the terms of the 1996 settlement agreement. (Knutrud Aff. ¶ 14 & Ex. C.)

The First Circuit has observed in dicta that, "differences in ... warranty protection or service commitments—may well render products non-identical in the relevant Lanham Trade–Mark Act sense." *Nestle*, 982 F.2d at 639 n. 7; *see also Norman M. Morris Corp. v. Weinstein*, 466 F.2d 137 (5th Cir.1972) (affirming injunction against defendant who purchased watches abroad with serial numbers removed and resold them in the United States without the original manufacturer's warranty). And the Second Circuit in *Original Appalachian Artworks* found that Spanish Cabbage Patch Kids dolls were materially different because they were accompanied by Spanish instructions and adoption papers. *See* 816 F.2d at 73; *see also Gamut Trading Co. v. United States Int'l Trade Comm'n.*, 200 F.3d 775, 781 (Fed.Cir.1999) (absence of "English instructional and warning labels, operator manuals, and service manuals" deemed material).

I note that Staples, on its "Warranty Statement" placard, promises to match Montblanc's warranty of one full year from time of purchase.[8] (Knutrud Aff. Ex. A.) As Montblanc demonstrated at the preliminary injunction hearing, its now current warranty description in fact provides a two-year warranty on Montblanc writing instruments purchased from authorized retailers.[9] (Tr. at 24, 32; 2d Supp. Martens

---

**7.** I note that Montblanc has for several years apparently offered a two-year warranty, a fact not asserted by Montblanc's counsel or acknowledged by Staples until the hearing in this matter. (*See* 2d Supp. Martens Decl. ¶ 4.)

**8.** The sticker on the outer box provides only a thirty-day guarantee. (*Id.* Ex. B.) At the preliminary injunction hearing, however, it was established that the sticker is put on by VCTC, not by Staples, and that Staples is prepared to match the longer Montblanc warranty. (Tr. at 25, 30.)

**9.** Montblanc refers to a one-year warranty at pages 7 and 15 of its Memorandum in Support of the Preliminary Injunction, but Montblanc counsel pointed out at the hearing that Montblanc's warranty booklet specifies two years. (Tr. at 32.) Martens explains that the reference to a one-year warranty was an inadvertent error; Montblanc introduced a two-year warranty several years ago. (2d Supp. Decl. Martens ¶ 4.)

Decl. ¶ 4.) Staples contends that its one-year warranty was instituted to match what it incorrectly believed to be Montblanc's warranty period, and is prepared to match the two-year warranty.

### c. *Conclusion*

In light of the First Circuit's holding that the threshold of materiality must be kept low enough to take account of "subtle differences," *Nestle*, 982 F.2d at 641, I find the differences discussed above, taken as a whole, to be "material." A consumer, in purchasing a Montblanc pen, would likely consider it relevant both that the pen was physically scarred by the removal of the Pix mark from the central band and that the pen was prone to corrosion because of the removal of gold plating. These are material impacts on both the appearance and integrity of the products. Montblanc's ability to maintain quality control is exacerbated by the eradication of the serial number. These material differences are of importance to the full range of Montblanc consumers. This is especially so given that many consumers purchase Montblanc writing instruments as gifts. The subtle differences between the writing instruments sold by Staples and those sold by Montblanc are likely to cause consumer confusion.[10]

### 2. *Disclosure by Staples*

#### a. *Policy and Practice*

Staples argues that any possible consumer confusion caused by its sale of Montblanc writing instruments is "completely dispelled by Staples' careful and full disclosure to consumers that Staples is not authorized to sell Montblanc writing instruments and that serial numbers and Pix marks have been removed by Montblanc's supplier." (Knutrud Aff. ¶¶ 4–7.)

Staples asserts that it is its policy and practice to post a sign as part of its display of Montblanc writing instruments stating:

### WARRANTY STATEMENT

Staples believes that Mont Blanc makes one of the most prestigious pens available in today's market. It is also one of the more expensive. Staples offers Mont Blanc writing instruments at a great discount to the manufacturers suggested retail. Staples is not an authorized Mont Blanc retailer, and as such, Mont Blanc will not honor their warranty on writing instruments purchased at Staples.

Staples will match the Mont Blanc warranty of one full year from time of purchase. If you experience any mechanical defect in the Mont Blanc writing instrument purchased at Staples within one year of purchase simply return it to Staples with proof of purchase for exchange.

(Knutrud Aff. Ex. A.)

Moreover, Staples states, the bottom of every outside box[11] contains a sticker reading:

This package contains one authentic and genuine Montblanc® pen or pencil in the original Montblanc® box, which this store sells at a significant discount to the manufacturer's suggested retail price. The package does not include the manufacturer's service guide and warranty,

10. I must note, that on this record and given Staples' undertaking to match the duration of the Montblanc warranty, I cannot find the warranty service information differences to be material. The warranty has not been shown to be substantively different and the lack of owner's manual is a difference Montblanc itself created several years ago. Such differences as appear in this record will not weigh in my balancing of the equities.

11. The "outside box" appears to be a cardboard box that slips over the actual hard case containing the writing instrument.

which was placed by the manufacturer in this original Montblanc® box. In addition, a PIX® trademark originally stamped on the inside of the clip, on the central band in the middle of the pen and/or on the Montblanc® refill has been removed. The serial number assigned to the Montblanc® pen by the manufacturer has also been removed. Because the importer, The Alpha Group is not an authorized Montblanc® dealer and because the manufacturer's service guide and warranty are not included in this package, the manufacturer may not honor its warranty from customers who purchased Montblanc® pens or pencils from this store.

This store, however, guarantees everything it sells, including Montblanc® pens & pencils. If you purchase a Montblanc® pen or pencil from us and it malfunctions, simply return it to the store within 30 days in the original box with your sales receipt for a replacement or full refund.

Montblanc® is a registered U.S. trademark of Montblanc–Simplo GmbH. PIX® is a registered U.S. trademark of Montblanc, Inc. The Alpha Group and this store are not affiliated with either Montblanc–Simplo GmbH or Montblanc, Inc.

(Knutrud Aff. Ex. B.)

Montblanc raises several concerns about the efficacy of Staples' disclosures in eliminating consumer confusion. First, the disclaimer sticker is printed in very small typeface. (Palin Decl. Ex. 2). Second, because the sticker is not affixed to the actual product or its case, but rather is located on the bottom of the outside box, Montblanc alleges that it offers no pre-sale protection from confusion. Consumers generally receive the outer box only after the purchase has been made, and people purchasing the product as a gift often do not receive the outer box. Finally, Mont-blanc contends that consumer confusion is exacerbated by the sticker's claim that Staples is selling an "authentic and genuine" Montblanc pen or pencil. (Supp. Martens Decl. ¶ 10.) With respect to the "warranty statement" displayed on Montblanc display cases in Staples stores, Montblanc contends that it is similarly deficient in that it fails to disclose the material differences between the writing instruments sold by Staples and those sold by authorized Montblanc dealers.

In support of its contention that the present form of notice used by Staples is inadequate, Montblanc cites incidents of actual consumer confusion. According to Martens, Montblanc has received requests for service from both Staples customers and people who have received the altered pens as gifts, and who were unaware that they would not receive warranty service from Montblanc. (2d Supp. Martens Decl. ¶ 5.)

At the practical level, the evidence before me also suggests that Staples does not always deploy the notices and disclaimers. On February 1, 2, 9, and 22, 2001, Lisa Palin visited a number of Staples stores for the purpose of purchasing Montblanc writing instruments pursuant to this action. (Palin Decl. ¶ 2.) At the Staples on Milk Street in Boston, the Montblanc display case contained no "warranty statement" placard. (Id. ¶ 3.) The placard was, however, displayed at every other Staples stores she visited. But at the Staples stores on Soldiers Field Road in Brighton, Alewife Brook Parkway in Cambridge, and Court Street in Boston, Palin did not receive the outer box with her purchases, and the inner cases contained no "disclaimer" stickers. (Id. ¶¶ 12, 18, 22.)

b. *Disclosure and Infringement*

■ The Supreme Court, in a case concerning the use of the "Champion" trade-

mark on reconditioned and repaired Champion spark plugs, held that, "inferiority is immaterial so long as the article is clearly and distinctively sold as repaired or reconditioned rather than as new.... Full disclosure gives the manufacturer all the protection to which he is entitled." [12] *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 129–30, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947). The Court emphasized that full disclosure as to the condition of the product was required to avoid liability for trademark infringement. "When the mark is used in a way that does not deceive the public we see no such sanctity in the [trademark] as to prevent its being used to tell the truth." *Champion Spark Plug,* 331 U.S. at 129.

More recently, the Second Circuit has permitted the use of disclaimers to address the problem of trademark infringement when they "are sufficient to avoid substantially the risk of consumer confusion" and are able to "mak[e] clear the source of a product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1315 (2d Cir.1987) (citations omitted); *but see Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1093 (7th Cir.1988) ("plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers"). Under this approach, Staples bears the burden of demonstrating the effectiveness of its disclaimers in significantly reducing or eliminating consumer confusion. *See id.* at 1315.

■ Even if the provision of adequate notice can eliminate the likelihood of point-of-sale confusion, however, point-of-sale disclaimers do not address the problem of post-sale confusion by non-purchasers.[13] An action for trademark infringement under the Lanham Act may be based on post-sale confusion of consumers other than direct purchasers, including observers of an allegedly infringing product in use by a direct purchaser, donees, or second-hand purchasers. *T & T Manuf. Co. v. AT Cross Co.,* 449 F.Supp. 813, 823 (D.R.I.) ("courts have recognized infringement even when the purchaser would be informed by reading the package, if the public generally, and users and donees more specifically, would remain confused by the similarity of the products"), *aff'd,* 587 F.2d 533 (1st Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979); *see also Payless Shoesource, Inc. v. Reebok Int'l Ltd.,* 998 F.2d 985, 989–90 (Fed.Cir.1993); *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 222 (1st Cir. 1989) ("[P]oint of sale confusion [is] not the only issue."); *Lois Sportswear,* 799 F.2d at 872 ("post-sale confusion as to source is actionable under the Lanham Act").

Notices provided by Staples only at the point-of-sale and on the pen case rather than on the actual product will be of little help in avoiding consumer confusion in the post-sales context. *See Lois Sportswear,* 799 F.2d at 873. Individuals who receive the altered pens as gifts or who see the pens being used by the actual purchasers may be unimpressed with the quality of Montblanc products and consequently decide not to purchase genuine unaltered Montblanc products. *See Rolex Watch*

---

**12.** Montblanc observes that in *Champion Spark Plug,* the remedy approved by the Court required, in part, that "the word 'Repaired' or 'Used' be stamped and baked on the plug by an electrical hot press in a contrasting color so as to be clearly and distinctly visible." 331 U.S. at 127, 67 S.Ct. 1136.

**13.** "Post-sale confusion" occurs when a consumer sees a product outside of a retail store and wrongly associates the product with the trademark holder, thereby potentially influencing a later purchasing decision. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872–73. (2d Cir.1986).

*U.S.A., Inc. v. 'Bud' Forrester*, 1986 WL 15668,*4 (S.D.Fla.1986).

A disclaimer may be an appropriate remedy if it "truthfully identifies the original manufacturer of a trademarked product while effectively disassociating the manufacturer/markholder from that product when used in a context that the markholder does not sponsor or approve." *In re Certain Agricultural Tractors Under 50 Power Takeoff Horsepower Investigation*, 44 U.S.P.Q.2d 1385, 1399–1400 (U.S. Int'l Trade Comm'n.1997). And in this context, disclaimers expressly declaring that the seller is "not affiliated" with the trademark owner have been found to prevent consumer confusion. *See Matrix Essential, Inc. v. Emporium Drug Mart, Inc.*, 756 F.Supp. 280, 282 (W.D.La.1991), *aff'd*, 988 F.2d 587 (5th Cir.1993); *Graham Webb Int'l Limited Partnership v. Emporium Drug Mart, Inc.*, 916 F.Supp. 909, 917 (E.D.Ark.1995) ("Drug Emporium's warning to consumers disclaiming any affiliation with or authorization by Graham Webb effectively prevents likelihood of confusion in the minds of consumers as to sponsorship or affiliation").

Both the "Warranty Statement" placard and the sticker affixed to the outer boxes explain that Montblanc will not honor its warranty on writing instruments purchased at Staples and that Staples is not an authorized Montblanc retailer. (Knutrud Aff. Exs. A–B.) There is currently a discrepancy with respect to the substance of the Staples warranty—the placard states that Staples will match Montblanc's one-year warranty while the sticker specifies a 30–day warranty—but this should not result in increased confusion concerning the source of the product. More troubling, however, is the fact that the placard mentions nothing about the removal of serial numbers and Pix trademarks. (*Id.* Ex. A.) Also of concern is the sticker's statement that the package "contains one *authentic and genuine* Montblanc pen or pencil in the original Montblanc box," (emphasis supplied) which consumers could interpret to mean that there are no discernible differences between the products. Even if these potential infirmities were cured, the fact remains on this record that as a matter of policy and practice not all consumers -particularly gift recipients—receive these disclosures. (Palin Decl. ¶¶ 3, 12, 18, 22.) Accordingly, I find that Staples has not shown that its disclosures, even when actually made, significantly reduce the risk of consumer confusion either pre-sale by purchases or post-sale by likely recipients of the instrument.

At my invitation during the preliminary injunction hearing, Montblanc drafted an alternative form of disclosure, detailing the differences between Montblanc pens sold through Staples and those sold by authorized retailers. Montblanc suggests that this notice must be stamped prominently on the top surface of both the exterior cardboard carton and the pen case, as well as printed in large type on a prominent placard next to all Staples' displays of Montblanc products. Montblanc also contends that, as recognized in both *Champion Spark Plug* and *Certain Agricultural Tractors*, notice must be provided on the product itself to protect against post-sale confusion. Accordingly, Montblanc contends that, if not enjoined from selling Montblanc instruments, Staples must conspicuously and indelibly stamp "Altered" or "Demarked" on each altered Montblanc pen it sells.

Before turning to consideration of any remedy, however, I must address the other elements of a preliminary injunction showing.

### B. Irreparable Harm

 Having determined that Montblanc has demonstrated a likelihood of success on the merits, I must now consider wheth-

er Montblanc will suffer irreparable harm in the absence of a preliminary injunction. Montblanc asserts that Staples' ongoing infringement causes irreparable harm to Montblanc by "causing consumers to believe, erroneously, that the altered, inferior products and services sold by Staples under [Montblanc's] Registered Marks are in fact genuine products and services sponsored and approved by [Montblanc,] and by diluting the market for and destroying the image of the Registered Marks as symbols of high-quality, prestige Montblanc writing instruments." Moreover, Montblanc contends, Staples' sales of altered pens irreparably damage Montblanc's relations with its authorized retailer distributors.

The First Circuit has held that "irreparable harm flows from an unlawful trademark infringement as a matter of law." *Nestle*, 982 F.2d at 640. "By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot be adequately compensated." *Id.; see also Helene Curtis*, 890 F.Supp. at 160 (quoting *Lobo Enters., Inc. v. Tunnel, Inc.*, 822 F.2d 331, 333 (2d Cir.1987) (irreparable injury is established in trademark case where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question")). Thus, where a plaintiff in a trademark case has demonstrated a likelihood of success on the merits, " 'irreparable injury . . . almost inevitably follows' and, indeed, is presumed." *Helene Curtis*, 890 F.Supp. at 160 (citations omitted); *see also I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998) (citation omitted); *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir.1988).

However, one exception to the rule that irreparable harm is presumed in an infringement case when the plaintiff demonstrates a likelihood of success on the merits is available where the plaintiff does not bring suit within a reasonable time of learning of the infringement. *Green Book Int'l Corp. v. Inunity Corp.*, 2 F.Supp.2d 112, 124 n. 9 (D.Mass.1998). Significant delay by the plaintiff in prosecuting its infringement claim in a trademark case "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Boustany*, 42 F.Supp.2d at 112 (citation omitted); *see also Fritz v. Arthur D. Little, Inc.*, 944 F.Supp. 95, 98 (D.Mass.1996) (unreasonable delay rebuts presumption of irreparable harm).

The Second Circuit has noted that

> The cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition. In these cases, it appeared indisputable that the trademark or copyright owners were well aware of their rights and had concluded that they were not violated.

*Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir.1995) (citations omitted).

Staples claims that Montblanc was aware of Staples' sale of Montblanc writing instruments for years before bringing the present action. (Knutrud Aff. ¶ 13.) Montblanc acknowledges that it has been "aware for some time that Staples has been selling Montblanc pens without authorization." (Martens Decl. ¶ 5.) Howev-

er, Montblanc contends that it only learned in December of 2000 that Staples was selling Montblanc writing instruments "from which both the serial number and Pix trademark on the gold-plated central band had been obliterated." (Supp. Martens Decl. ¶ 3.) These new alterations, in combination with previous alterations, "convinced Montblanc that it would likely prevail if it were to bring a trademark infringement claim against Staples." (*Id.*)

A preliminary question, therefore, is whether Montblanc learned of Staples' allegedly infringing actions years ago, as Staples contends, or as of December 2000, as Montblanc contends. On this record, I find that Montblanc first learned of the material infringement in December 2000, and further find that Montblanc's delay of several months before filing for injunctive relief was reasonable.

When Staples first began selling Montblanc products, Montblanc had no copyright protection for the box, the serial numbers were not being removed, and the Pix marks (which were removed) appeared only on the ink cartridges and on the underside of the pen clip. (Martens Decl. ¶ 5.) Montblanc explains that, because those alterations were not "so extreme and clearly material," it did not bring a claim for trademark infringement because it did not believe such a claim would succeed. (*Id.*)

Thereafter, Montblanc created a new box that qualified for copyright protection. In 1996, when Montblanc learned that Staples was selling Montblanc writing instruments in Montblanc's copyrighted box, Montblanc filed a copyright infringement action, as to which Montblanc and Staples entered into a settlement agreement in August of 1996. (Martens Decl. ¶ 6.) Under the terms of the agreement, Staples agreed to stop selling "packaging, warranty and service material bearing the 'Montblanc Design.'" (Knutrud Aff. Ex. C.) I

find that, because the agreement only applied to the copyrighted box and not to the actual writing instruments, Montblanc did not consent to Staples' continued sale of Montblanc pens.

To be sure, for over five years, Montblanc has sold its writing instrument refills to Staples directly, which Staples contends is additional evidence of Montblanc's awareness that Staples sells Montblanc writing instruments. (Knutrud Aff. ¶ 15.) I find plausible Montblanc's explanation that it only sells refills to Staples to increase convenience to owners of Montblanc products, and that there is "simply no connection between Montblanc's willingness to sell refills to Staples and many other general retailers and Montblanc's policy and practice of confining authorized sales of Montblanc writing instruments, themselves, to a select group of retail establishments." (Martens Decl. ¶ 14.)

And, over two years ago, Montblanc apparently asked Staples to stop selling Montblanc Meisterstuck ballpoint pens in exchange for an agreement by Montblanc to sell other Montblanc writing instruments directly to Staples. (Knutrud Aff. ¶ 15.) Montblanc acknowledges that it contacted Staples about selling its products to Staples directly, but states that it offered to let Staples sell Montblanc rollerball pens if it agreed to stop selling Montblanc ballpoint and fountain pens. Staples refused and no agreement was reached. (Martens Decl. ¶ 8.) This effort at a commercial resolution of a percolating dispute does demonstrate awareness of a potential trademark action.

But matters did not become framed in their current posture until February 2000. Montblanc began placing the Pix mark in a "prominent position in the exterior gold rings at the base of the pen cap." (Martens Decl. ¶ 9.) And it was in December of 2000, that Montblanc alleges it found for

the first time writing instruments offered for sale by Staples with both the serial numbers removed and the Pix mark removed from the rings on the pen cap. (Martens Decl. ¶ 10.) Montblanc acted with all due speed thereafter.

On December 20, 2000, Montblanc's counsel sent a "cease-and-desist" letter informing Staples that its sale of altered Montblanc writing instruments infringed Montblanc's trademarks, and that any future sales would constitute willful infringement. (Martens Decl. Ex. H; Supp. Martens Decl. ¶ 3.) When Staples continued to sell Montblanc writing instruments, Montblanc filed the present action on February 8, 2001.

It appears a factual dispute exists as to when Montblanc learned of the removal of the serial numbers. Staples alleges that Montblanc knew or should have known for years that Staples sold Montblanc writing instruments with obliterated serial numbers. Robert George, Staples' Senior Vice President/General Merchandise Manager Supplies, states that Staples sold Montblanc writing instruments with the serial numbers removed since at least 1994. (Def. Supp. Filing Ex. A ¶¶ 1–2.) As of 1994, according to George, it was Staples' purchasing requirement that all serial numbers on Montblanc pens be removed prior to purchase by Staples for resale. (*Id.* ¶ 2.) Staples also relies on Knutrud's experience with a Montblanc customer service representative over three years ago. (Supp. Knutrud Aff ¶ 3.) When Knutrud, pretending to have received a Montblanc pen as a gift, explained that his pen had no serial number, the customer service representative explained that Staples, Office Max, and some other unauthorized retailers sold Montblanc pens with obliterated serial numbers, and informed Knutrud that the Montblanc warranty did not apply to pens purchased from such retail stores. (Supp. Knutrud Aff. ¶ 3.)

Montblanc has submitted a spreadsheet detailing its 2000 and 2001 monitoring by purchase of Staples' distribution of altered Montblanc writing instruments. (2d Supp. Martens Decl. ¶ 3.) The spreadsheet shows that only one of the 72 pens purchased by Montblanc from Staples stores during the year 2000 had its serial number removed.[14] (2d Supp. Martens Decl. ¶ 3.)

If Montblanc is deemed to have known of all of Staples' infringing actions since 1996 or even 1999 and waited until February of 2001 to file the motion for preliminary injunction, its lengthy delay in seeking enforcement of its rights would likely rebut the presumption of irreparable harm. And in this connection, I will tailor the interlocutory remedy to address only the controversy as most recently framed. However, Montblanc has explained that it did not seek a preliminary injunction until 2001 because it was not until December of 2000 that it learned of Staples' sale of Montblanc products that were without question "materially different" from authorized Montblanc products. As I have previously held, it is reasonable for a plaintiff to file for relief which it previously had not sought when there is a change in market conditions. *See, e.g., Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1014 (D.Mass.1988).

Despite the factual dispute as to when Montblanc first learned of the obliterated serial numbers, in light of Montblanc's established monitoring practices, I find the thrust of Montblanc's version of events to be persuasive. Although there are some indications of Montblanc's knowledge of the practice of removing serial numbers only, such as Knutrud's conversation with

14. The pen with the obliterated serial number was purchased in August of 2000 from a Staples store in New Jersey. (2d Supp. Martens Decl. Ex. A.)

Montblanc's customer service representative and the Montblanc service representative's awareness of how "collectors" obtain their supply, this is insufficient to rebut the presumption of irreparable harm which reached a critical mass in December, 2000. I find that Montblanc did not learn of Staples' infringing conduct—the sale of Montblanc writing instruments with both the serial numbers removed and the Pix marks obliterated from the central band—until December of 2000.

Under these circumstances, Montblanc's delay of several months after the incidents of infringement reached a critical mass before filing for an injunction was reasonable. A modest delay in filing suit does not rebut the presumption of irreparable harm if the delay is caused by the plaintiff's good faith efforts to investigate the infringement. *See Fisher–Price, Inc. v. Well–Made Toy Manuf. Corp.*, 25 F.3d 119, 124 (2d Cir.1994) (citations omitted). In *Boustany*, the plaintiff waited approximately eight months after learning of the defendant's use of its mark before bringing an action. Yet despite this delay, the court found that the plaintiff had not forfeited the presumption of irreparable harm, noting that "the plaintiff was not indolent or passive in the interim. . . . [T]he plaintiff had meetings with his staff, sought advice from counsel, and began a course of what he calls 'cease and desist' communications to [the defendant]." *Boustany*, 42 F.Supp.2d at 112.

Montblanc sent a "cease-and-desist" letter to Staples on December 20, 2000, shortly after learning that Staples was selling Montblanc writing instruments with the serial numbers removed and the Pix marks obliterated from the central gold band. Its subsequent two-month delay in filing this action was neither significant nor unreasonable in light of the circumstances.

Staples, relying primarily on *Warner Lambert v. McCrory's Corp.*, 718 F.Supp. 389 (D.N.J.1989), also contends that Montblanc's failure to take action against other retailers that have been selling altered Montblanc writing instruments undermines Montblanc's claim of irreparable harm. In *Warner Lambert*, the court denied the preliminary injunction motion in part because of the plaintiff's inaction against other retailers' use of the disputed trade dress. *Id.* at 394 (prior inaction dilutes equity of court to "preliminarily enjoin the defendant from selling the type of product plaintiff has idly watched other retailers sell for years"). But in *Warner Lambert*, the plaintiff admitted to having knowledge of the existence of the allegedly infringing private label brands of mouthwash for ten years. In contrast, there is no evidence that Montblanc knew of the sale by third party retailers of Montblanc pens with both obliterated serial numbers and Pix marks removed from the central band any sooner than it learned of Staples' allegedly infringing sales. In light of the parallel lawsuits filed by Montblanc against OfficeMax and Office Depot, it is reasonable to assume that Montblanc learned of the actions by other retailers at roughly the same time it learned of Staples' actions.

## C. Harm to Staples from Injunction

■ Montblanc argues that an injunction would have little impact upon Staples' business, because the sale of Montblanc writing instruments constitutes a very small percentage of Staples' total sales. Staples responds that, because the Montblanc writing instruments are "draw" items for consumers, if consumers are able to purchase Montblanc products at Office-Max and Office Depot but not at Staples,[15]

---

**15.** This argument is not compelling in light of the fact that Montblanc has initiated virtually identical litigation against both OfficeMax and Office Depot.

Staples will lose an "untold amount of sales of additional stationery and office supply products made by those purchasers when they go in to buy (or just shop for) Montblanc writing instruments." (Knutrud Aff. ¶ 17.)

I am of the view that "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Concrete Machinery Co.,* 843 F.2d at 612 (citation omitted). Furthermore, harm to the defendant as a result of an injunction is "entitled to less consideration than other harms." *Fritz,* 944 F.Supp. at 97 (citing *Concrete Machinery Co.,* 843 F.2d at 612–13). Accordingly, I find that the potential harm to Montblanc outweighs any harm which granting the requested injunctive relief would impose upon Staples.

### D. Public Interest

■ Montblanc contends that a preliminary injunction would serve the public interest "by eliminating the confusion caused by Defendant's practices and protecting consumers from unwittingly purchasing products that have been physically and materially altered in a detrimental manner."

In trademark cases, the public interest almost always favors the granting of otherwise "appropriate injunctions." *Fritz,* 944 F.Supp. at 97 (citing *Concrete Machinery Co.,* 843 F.2d at 612). I therefore find that the granting of injunctive relief will not adversely affect the public interest.

### III. REMEDY

■ In light of the necessarily provisional character of the record, and in particular my view that any interlocutory remedy should be tailored to address specifically those circumstances which gave rise to this litigation at this time, I will grant Montblanc only a portion of the relief it seeks in the form of barring sales and will also strengthen the notice which Staples contends is the proper remedy.

Because Montblanc did not choose to commence litigation until the Pix mark was obliterated from the exterior gold rings at the pen cap, I will only bar the sale by Staples of Montblanc writing instruments with both the Pix mark in that location and the serial number removed. With respect to the sale of other Montblanc writing instruments by Staples, I will require that the notice placards and the outer box stickers be modified and that notice be stamped on the hard case actually containing the writing instrument.

### IV. CONCLUSION

For the reasons set forth more fully above, Montblanc's motion for a preliminary injunction is GRANTED to the extent reflected in the attached Preliminary Injunction.

### *PRELIMINARY INJUNCTION*

After hearing and review of the initial and supplemental submissions of the parties, pursuant to Fed.R.Civ.P. 65, it is hereby ORDERED:

That Defendant, its officers, agents, servants, employees, and persons in active concert or participation with them, are hereby preliminarily enjoined, pending further order of the court:

(1) From selling, repackaging, marketing or otherwise distributing in the United States any Montblanc writing instruments from which (a) the serial numbers and (b) the Pix mark (Reg. Nos. 2,087,771 and 624,087) on the exterior gold rings have been obliterated or otherwise removed.

(2) From selling, repackaging, marketing or otherwise distributing in the United States any Montblanc writing instruments unless:

(a) a sign containing the following text[1] on a placard prominently positioned at the points of display and sale:

### WARRANTY STATEMENT*

Staples believes that *Mont Blanc* **Montblanc** makes one of the most prestitious pens available in today's market. It is also one of the more expensive. Staples offers *Mont Blanc* **Montblanc** ® writing instruments at a great discount to the manufacturers suggested retail **because they have been altered and demarked.** Staples is not an authorized *Mont Blanc* **Montblanc**® retailer, and as such, *Mont Blanc* **Montblanc** will not honor their warranty on writing instruments purchased at Staples.

Staples will match the *Mont Blanc* **Montblanc** warranty of *one* **two** full years from time of purchase. If you experience any mechanical defect in the *Mont Blanc* **Montblanc**® writing instrument purchased at Staples within *one* **two** years of purchase simply return it to Staples with proof of purchase for exchange.

(b) a sticker on the outer box used for packaging the instrument and its case containing the following text[2]:

This package contains *one authentic and genuine* **a** Montblanc® pen or pencil in the original Montblanc® box, which this store sells at a significant discount to the manufacturer's suggested retail price **because it has ben altered and demarked.** The package does not include the manufacturer's service guide and waranty, which wasa placed by the manufactuer in this original Montblanc® box. In addition, a PIX® trademark originally stamped on the inside of the clip, *on the central band in the middle of the pen* and/or on the Montblanc® refill has been removed. The serial number assigned to the Montblanc® pen by the manufacturer as also been removed. Because the importer, The Alpha Group is not an authorized Montblanc® dealer and because the manufacturer's service guide and warranty are not included in this package, the manufacturer *may* **will** not honor its warranty from customers who purchased Montblanc® pens or pencils from this store.

This store, however, guarantees everything it sells, including Montblanc® pens & pencils. If you purchase a Montblanc® pen or pencil from us and it malfunctions, simply return it to the store within *30 days* **two years** in the original box with your sales receipt for a replacement or full refund.

Montblanc® is a registered U.S. trademark of Montblanc-Simplo GmbH. PIX® is a registered trademark of Montblanc, Inc. The Alpha Group and this store are not affiliated with either Montblanc–Simplo GmbH or Montblanc, Inc.

(c) the following text is stamped in at least 120 point type on the case actually holding the writing instrument.

This Montblanc® writing instrument has been altered and demarked. Montblanc will not honor any warranty for this writing instrument.

---

1. The text is set forth here as a "redline" modifation of the placard currently in use by defendant. Language which must be deleted is indicated in italics; language which must be inserted is indicated in bold.

* Editor's Note: Format used to designate deletions and insertions in the Warranty Statement have been revised to meet publication requirements. The editorial changes are reflected in footnotes 1 and 2.

2. The text is set forth here as a "redline" modification of the outer box sticker currently in use by defendant. Language which must be deleted is indicated in italics; language which must be inserted is indicated in bold.

And it is further ORDERED

That this preliminary injunction shall become effective upon the giving of security in the amount of $100,000 pursuant to Fed.R.Civ.P. 65(c).